IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE GOOGLE ACCOUNT **DEVINWYNES3@GMAIL.COM** THAT IS STORED AT PREMISES CONTROLLED BY GOOGLE LLC AND/OR GOOGLE PAYMENT CORPORATION | Case No. 5:25-mj-00026 |

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, Andrew Hayden, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for a search warrant for information associated with a certain account that is stored at premises owned, maintained, controlled, or operated by Google LLC and/or Google Payment Corporation ("Google"), an electronic communications service and/or remote computing service provider headquartered at 1600 Amphitheater Parkway, Mountain View, California 94043. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Google to disclose to the government the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

2. I am a Special Agent of Homeland Security Investigations ("HSI") and am an investigative or law enforcement officer of the United States, within the meaning of 18 U.S.C.

1

§ 2510(7) and Fed. R. Crim. P. 41(a)(2)(C). In that capacity, I am empowered to investigate violations of federal law and am authorized to apply for federal search warrants.

3. I have been an HSI Special Agent since 2017. I am a graduate of the Criminal Investigations Training Program ("CITP") and the Immigration and Customs Enforcement ("ICE") HSI Special Agent Training Program ("HSISAT") at the Federal Law Enforcement Training Center ("FLETC") at Glynco, Georgia. Prior to my employment with HSI, I was the Chief Criminal Investigator for the Missouri Bureau of Narcotics and Dangerous Drugs ("BNDD") and a Criminal Investigator for the Missouri Department of Corrections ("MODOC"). I have a master's degree in Homeland Security with a primary emphasis in Criminal Justice. My duties as an HSI Special Agent include, but are not limited to, the investigation and enforcement of Titles 8, 18, 19, 21, and 31 of the United States Code.

4. As part of my daily duties as an HSI Special Agent, I investigate criminal violations relating to the illicit manufacturing and distribution of controlled substances. I have received training in those areas and have had the opportunity to participate in and conduct investigations involving the manufacturing and distribution of controlled substances.

5. The statements contained in this affidavit are based upon my personal knowledge, as well as information provided to me by other law enforcement officials. All observations not personally made by me were related to me by the individuals who made them or were conveyed to me by my review of records, documents, and other physical evidence obtained during this investigation.

6. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

7. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that a violation of 21 U.S.C. § 843(a)(7) (unlawful importation of equipment used to manufacture controlled substances) has been committed by Devin WYNES ("WYNES"). There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband, and/or fruits of such crime as further described in Attachment B.

## JURISDICTION

8. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. § 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

9. On February 2, 2025, officers with United States Customs and Border Protection ("CBP") selected a parcel entering the United States mail system from the United Kingdom for routine examination. The contents of the shipment were described as "parts for non-specific machinery." Upon examination, the parcel was found to contain one pill press die set. The pill press die set was identified based on its physical characteristics and from prior CBP seizures involving pill press die sets. The parcel's return address was "LDN Metal Works, LTD, 38 Laburnum Crescent, Kidlington, Kidlington, KID OX5, UK." The parcel was addressed to WYNES at the address "1801 Tuckahoe Road, White Sulphur Springs, WV 24986."

10. HSI was notified of the parcel's seizure on February 2, 2025, and the information was forwarded to HSI's Charleston, West Virginia, office. HSI requested the parcel be sent to the Charleston, West Virginia, office for the purpose of conducting a controlled delivery at WYNES's

residence in Greenbrier County, West Virginia. When the parcel arrived on February 4, 2025, I inspected the contents. The pill press die set in the package appears below:



11.     Based on my training and experience, I know that die mold sets are used on pill press machines to stamp a shape and design into counterfeit prescription pills and/or pills consisting of controlled substances. The emblem embossed on the pills is used to counterfeit a legitimate pharmaceutical trademark or, in the case of pills solely containing controlled substances, to serve as a brand identifier for distributors of controlled substances.

12.     The die mold set pending shipment to WYNES included what appeared to be an emblem of an alien face. I know from my training experience that the shape of the die mold set, combined with the alien emblem, is commonly used in the production of 3,4-Methylenedioxymethamphetamine ("MDMA") pills, otherwise known as "ecstasy." MDMA is a Schedule I controlled substance. I also know that individuals are pressing fentanyl, a Schedule II controlled substance, into pills that bear logos, designs, or other identifiers.

13.     I reviewed CBP international import records for other similar shipments to WYNES's address. Those records reflected that on February 17, 2024, a shipment originating in

China and manifested as a "tool set" weighing approximately 2.1 kilograms was destined for WYNES's address. That shipment was not seized. I know from my training and experience that "tools" and "tool parts" are common descriptions used for pill presses and pill press accessories in order to conceal the illegal nature of such items. The shipper of the parcel was "Quian Kuan" of "No. 3 Jingang North Third Road, Guangzhou, China." That shipper has been identified through previous CBP seizures as the shipper of numerous contraband items entering the United States from China.

14. On February 21, 2025, I, along with HSI Special Agent Christopher Yarnell, met with law enforcement officers from Greenbrier County, West Virginia, and United States Postal Inspectors to coordinate and execute a controlled delivery at WYNES's residence. Prior to the controlled delivery, law enforcement obtained an anticipatory search warrant from a Greenbrier County, West Virginia, Circuit Judge allowing law enforcement to execute a search warrant at WYNES's residence in the event the parcel was accepted by someone at the residence during the controlled delivery.

15. On February 21, 2025, United States Postal Inspectors utilized a mail truck from the post office in White Sulphur Springs, Greenbrier County, West Virginia, to hand-deliver to the parcel seized by CBP on February 2, 2025, to WYNES's residence. The parcel was accepted by a female present at the home, who was later identified as WYNES's spouse. United States Postal Inspectors then notified me and the other law enforcement officers that the parcel had been accepted.

16. After WYNES's spouse accepted the parcel, Greenbrier County, West Virginia, law enforcement officers went to the residence to execute the search warrant. WYNES's spouse informed officers that WYNES had moved out of the residence approximately one month prior

and was living at the Old Schoolhouse Hotel in White Sulphur Springs, Greenbrier County, West Virginia. She told officers that she had texted WYNES when she received the parcel from the United States Postal Inspectors, and WYNES responded to the text by stating, "Good, I need that." WYNES's spouse showed the text conversation to the officers. She said she didn't know WYNES to be involved in the use or manufacture of any type of pills. No items were seized from the residence during the execution of the search warrant.

17. Meanwhile, as officers were executing the search warrant at WYNES's residence, other officers traveled to the Old Schoolhouse Hotel to locate WYNES. WYNES was present at the hotel, and officers detained him and brought him to the parking lot of a church near his residence. Officers briefly spoke with WYNES there and asked him for permission to return to his room at the hotel to question him further. WYNES agreed to travel back to the hotel with officers.

18. Upon returning to the hotel, WYNES led officers to his room and invited them inside. Officers explained the situation to WYNES and informed him of his *Miranda* rights, and he agreed to waive them and speak with officers. He also consented to a search of the hotel room.

19. WYNES explained to officers that he had ordered the pill press die set for a male he refused to identify that he knew from previous employment. WYNES said that the unidentified male ("UM") had sent him a link to the pill press die set via email and sent WYNES cryptocurrency to pay for it. WYNES explained that all the communications between himself and the UM occurred in his Google Account using the email address devin.wynes@gmail.com. Although WYNES refused to provide officers with the UM's name, he said the UM was from the area around Beckley, Raleigh County, West Virginia. WYNES explained that he did not want to name the UM because he feared who the UM was affiliated with and said he wanted to talk to an attorney before

6

providing additional information regarding the UM. After WYNES made that statement, officers terminated the interview and provided WYNES with contact information to give to his attorney.

20. After a search of the hotel room, law enforcement seized WYNES's cellphone and computer tower. WYNES provided his telephone number but declined to provide the passcode for the device. The Greenbrier County, West Virginia, Sheriff's Department took custody of both items. Law enforcement then departed the hotel.

21. On May 15, 2025, I obtained a federal search warrant for the email address devin.wynes@gmail.com, which WYNES had told law enforcement he used to communicate with the UM about the pill press die set. However, a review of the information received from Google in response to the search warrant showed no communications regarding the pill press die set.

22. On June 11, 2025, HSI reviewed US CBP import records, which showed that the consignee of the USPS parcel seized on February 2, 2025, used the email address devinwynes3@gmail.com (i.e., the account described in Attachment A). HSI then sent a preservation request to Google for the preservation of all data related to that email account. An extension was submitted on August 20, 2025.

23. On July 18, 2025, HSI received subscriber information for the email account devinwynes3@gmail.com (i.e., the account described in Attachment A) pursuant to an administrative subpoena. The account was subscribed to WYNES and was created on September 3, 2011. The account used various Google services, including Gmail and Google Pay (formerly known as Google Wallet). WYNES was listed as the Google Pay/Google Wallet customer. The telephone number associated with the account also traced to WYNES, according to records provided by Verizon Wireless pursuant to an administrative subpoena.

## BACKGROUND CONCERNING GOOGLE[1]

24.     Google is a United States company that offers to the public through its Google Accounts a variety of online services, including email, cloud storage, digital payments, and productivity applications, which can be accessed through a web browser or mobile applications. Google also offers to anyone, whether or not they have a Google Account, a free web browser called Google Chrome, a free search engine called Google Search, a free video streaming site called YouTube, a free mapping service called Google Maps, and a free traffic tracking service called Waze. Many of these free services offer additional functionality if the user signs into their Google Account.

25.     In addition, Google offers an operating system ("OS") for mobile devices, including cellular phones, known as Android. Google also sells devices, including laptops, mobile phones, tablets, smart speakers, security cameras, and wireless routers. Users of Android and Google devices are prompted to connect their device to a Google Account when they first turn on the device, and a Google Account is required for certain functionalities on these devices.

26.     Signing up for a Google Account automatically generates an email address at the domain gmail.com. That email address will be the log-in username for access to the Google Account.

27.     Google advertises its services as "One Account. All of Google working for you." Once logged into a Google Account, a user can connect to Google's full suite of services offered to the general public, described in further detail below. In addition, Google keeps certain records

---

[1] The information in this section is based on information published by Google on its public websites, including, but not limited to, the following webpages: the "Google legal policy and products" page available to registered law enforcement at lers.google.com; product pages on support.google.com; or product pages on about.google.com.

indicating ownership and usage of the Google Account across services, described further after the description of services below.

28.     **Gmail.**  Google provides email services (called Gmail) to Google Accounts through email addresses at gmail.com or enterprise email addresses hosted by Google. Gmail can be accessed through a web browser or a mobile application. Additional email addresses ("recovery," "secondary," "forwarding," or "alternate" email addresses) can be associated with the Google Account by the user. Google preserves emails associated with a Google Account indefinitely, unless the user deletes them.

29.     **Contacts.**  Google provides an address book for Google Accounts through Google Contacts. Google Contacts stores contacts the user affirmatively adds to the address book, as well as contacts the user has interacted with in Google products. Google Contacts can store up to 25,000 contacts. Users can send messages to more than one contact at a time by manually creating a group within Google Contacts or communicate with an email distribution list called a Google Group. Users have the option to sync their Android mobile phone or device address book with their account so it is stored in Google Contacts. Google preserves contacts indefinitely, unless the user deletes them. Contacts can be accessed from the same browser window as other Google products like Gmail and Calendar.

30.     **Calendar.**  Google provides an appointment book for Google Accounts through Google Calendar, which can be accessed through a browser or mobile application. Users can create events or RSVP to events created by others in Google Calendar. Google Calendar can be set to generate reminder emails or alarms about events or tasks, repeat events at specified intervals, track RSVPs, and auto-schedule appointments to complete periodic goals (like running three times a week). A single Google Account can set up multiple calendars. An entire calendar can be shared

with other Google Accounts by the user or made public so anyone can access it. Users have the option to sync their mobile phone or device calendar so it is stored in Google Calendar. Google preserves appointments indefinitely, unless the user deletes them. Calendar can be accessed from the same browser window as other Google products like Gmail and Calendar.

31. **Messaging.** Google provides several messaging services including Duo, Messages, Hangouts, Meet, and Chat. These services enable real-time text, voice, and/or video communications through browsers and mobile applications, and also allow users to send and receive text messages, videos, photos, locations, links, and contacts. Google may retain a user's messages if the user hasn't disabled that feature or deleted the messages, though other factors may also impact retention. Google does not retain Duo voice calls, though it may retain video or voicemail messages.

32. **Google Drive.** Google Drive is a cloud storage service automatically created for each Google Account. Users can store an unlimited number of documents created by Google productivity applications like Google Docs (Google's word processor), Google Sheets (Google's spreadsheet program), Google Forms (Google's web form service), and Google Slides (Google's presentation program). Users can also upload files to Google Drive, including photos, videos, PDFs, and text documents, until they hit the storage limit. Users can set up their personal computer or mobile phone to automatically back up files to their Google Drive Account. Each user gets 15 gigabytes of space for free on servers controlled by Google and may purchase more through a subscription plan called Google One. In addition, Google Drive allows users to share their stored files and documents with up to 100 people and grant those with access the ability to edit or comment. Google maintains a record of who made changes when to documents edited in Google productivity applications. Documents shared with a user are saved in their Google Drive in a folder

called "Shared with me." Google preserves files stored in Google Drive indefinitely, unless the user deletes them. Android device users can also use Google Drive to back up certain data from their device. Android backups on Google Drive may include mobile application data, device settings, file downloads, and SMS messages. If a user subscribes to Google's cloud storage service, Google One, they can opt to back up all the data from their device to Google Drive.

33. **Google Pay.** A subsidiary of Google, Google Payment Corporation, provides Google Accounts an online payment service called Google Pay (previously Google Wallet), which stores credit cards, bank accounts, and gift cards for users and allows them to send or receive payments for both online and brick-and-mortar purchases, including any purchases of Google services. Users may delete some data associated with Google Pay transactions from their profile, but Google Payment Corporation retains some records for regulatory purposes.

34. **Chrome.** Google offers a free web browser service called Google Chrome which facilitates access to the Internet. Chrome retains a record of a user's browsing history and allows users to save favorite sites as bookmarks for easy access. If a user is logged into their Google Account on Chrome and has the appropriate settings enabled, their browsing history, bookmarks, and other browser settings may be saved to their Google Account in a record called My Activity.

35. **My Activity.** My Activity also collects and retains data about searches that users conduct within their own Google Account or using the Google Search service while logged into their Google Account, including voice queries made to the Google artificial intelligence-powered virtual assistant Google Assistant or commands made to Google Home products. Google also has the capacity to track the websites visited using its Google Chrome web browser service, applications used by Android users, ads clicked, and the use of Google applications by iPhone users. According to Google, this search, browsing, and application use history may be associated

11

with a Google Account when the user is logged into their Google Account on the browser or device and certain global settings are enabled, such as Web & App Activity. Google Assistant and Google Home voice queries and commands may also be associated with the account if certain global settings are enabled, such as Voice & Audio Activity tracking. Google maintains these records indefinitely for accounts created before June 2020, unless the user deletes them or opts in to automatic deletion of their location history every three or eighteen months. Accounts created after June 2020 auto-delete Web & App Activity after eighteen months unless the user affirmatively changes the retention setting to indefinite retention or auto-deletion at three months.

36. Google integrates its various services to make it easier for Google Accounts to access the full Google suite of services. For example, users accessing their Google Account through their browser can toggle between Google Services via a toolbar displayed on the top of most Google service pages, including Gmail and Drive. Google Hangout, Meet, and Chat conversations pop up within the same browser window as Gmail. Attachments in Gmail are displayed with a button that allows the user to save the attachment directly to Google Drive. If someone shares a document with a Google Account user in Google Docs, the contact information for that individual will be saved in the user's Google Contacts. Google Voice voicemail transcripts and missed call notifications can be sent to a user's Gmail Account. And if a user logs into their Google Account on the Chrome browser, their subsequent Chrome browser and Google Search activity is associated with that Google Account, depending on user settings.

37. When individuals register with Google for a Google Account, Google asks users to provide certain personal identifying information, including the user's full name, telephone number, birthday, and gender. If a user is paying for services, the user must also provide a physical address and means and source of payment.

38.     Google typically retains and can provide certain transactional information about the creation and use of each account on its system. Google captures the date on which the account was created, the length of service, log-in times and durations, the types of services utilized by the Google Account, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via Google's website or using a mobile application), details about the devices used to access the account, and other log files that reflect usage of the account. In addition, Google keeps records of the Internet Protocol ("IP") addresses used to register the account and accept Google's terms of service, as well as the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the Google Account.

39.     Google maintains the communications, files, and associated records for each service used by a Google Account on servers under its control. Even after a user deletes a communication or file from their Google Account, it may continue to be available on Google's servers for a certain period of time.

40.     In my training and experience, evidence of who was using a Google Account and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

41.     Based on my training and experience, messages, emails, voicemails, photos, videos, documents, and internet searches are often created and used in furtherance of criminal activity, including to communicate and facilitate the offense under investigation. Thus, stored

communications and files connected to a Google Account may provide direct evidence of the offense under investigation.

42. In addition, the user's account activity, logs, stored electronic communications, and other data retained by Google can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

43. Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (*e.g.,* information indicating a plan to commit a crime), or consciousness of guilt (*e.g.,* deleting account information in an effort to conceal evidence from law enforcement).

44. Other information connected to the use of a Google Account may lead to the discovery of additional evidence. For example, the apps downloaded from the Google Play store may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators. In addition, emails, instant messages, Internet activity,

documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

45. Therefore, Google's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Google services. In my training and experience, such information may constitute evidence of the crime under investigation, including information that can be used to identify the account's user or users.

## CONCLUSION

46. Based on the forgoing, I request that the Court issue the proposed search warrant.

47. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving the warrant on Google. Because the warrant will be served on Google, which will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Further your Affiant sayeth naught.

*Andrew C. Hayden*
Andrew Hayden, Special Agent
Homeland Security Investigations

Subscribed and sworn to by telephone pursuant to Fed. R. Crim. P. 4.1 on September 23rd, 2025.



*Omar J. Aboulhosn*
Omar J. Aboulhosn
United States Magistrate Judge